## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| OREGON-IDAHO UTILITIES, INC and MEDIASNAP SOLUTIONS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE NO. 1:17-cv-03016-ELR |
| v. | ) ) | |
| SKITTER CABLE TV, INC.; SKITTER, INC; GALVA CABLE COMPANY, LLC; SOUTHEAST CONTENT GROUP, LLC; TBM CONTENT PARTNERS, LLC; and ROBERT SAUNDERS, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Oregon-Idaho Utilities, Inc., an Oregon Corporation, and MediaSnap Solutions LLC, a Delaware limited liability company, by and through their attorneys of record, hereby complain and allege against Defendants as follows:

## PARTIES

1.    Defendant Skitter Cable TV, Inc. (hereinafter "Skitter Cable TV") is a corporation in the State of Georgia, duly organized pursuant to Georgia state law,

Georgia State Corporations Division Control No. 11050552, with its principal place of business in Georgia. Defendant Skitter Cable TV, Inc. was formerly known as Skitter Technologies, Inc. until September 24, 2014, when the corporate name was changed. Defendant Skitter Cable TV is a wholly-owned subsidiary of Defendant Skitter, Inc.

2. Defendant Skitter, Inc. ("Skitter, Inc.") is a corporation in the State of Georgia, duly organized pursuant to Georgia state law, Georgia State Corporations Division Control No. 09013778, with its principal place of business in Georgia. Skitter, Inc. is the parent corporation of Defendant Skitter Cable TV. (Skitter Cable TV and Skitter, Inc., shall be collectively referred to as "Skitter.")

3. Defendant Galva Cable Company, LLC ("Galva") is a limited liability company in the State of Georgia, duly organized pursuant to Georgia state law, Georgia State Corporations Division Control No. 12100421. Galva has one member: Skitter, Inc., a citizen of Georgia. Galva is a subsidiary of Skitter, Inc. Skitter, Inc. is the managing partner of Galva.

4. Defendant Southeast Content Group, LLC ("Southeast Content Group") is a limited liability company in the State of Georgia, duly organized pursuant to Georgia state law, Georgia State Corporations Division Control No. 11050547. Southeast Content Group has one member: Skitter, Inc., a citizen of Georgia.

5.     Defendant TBM Content Partners, LLC ("TBM Content Partners") is a limited liability company in the State of Georgia, duly organized pursuant to Georgia state law, Georgia State Corporations Division Control No. 12017422. TBM Content Partners has one member: Skitter, Inc., a citizen of Georgia.

6.     Defendant Robert Saunders ("Mr. Saunders") is an individual.  He is the Chief Executive Officer of both Skitter Cable TV and Skitter, Inc. Based upon information and belief, Mr. Saunders is an officer or member of, and/or serves in various leadership capacities for, Defendants TBM Content Partners, Southeast Content Group, Galva, and non-party Video 6, LLC ("Video 6").  Mr. Saunders is a citizen of the State of Georgia.

7.     Plaintiff Oregon-Idaho Utilities, Inc. ("OIU") is an Oregon corporation, duly organized pursuant to Oregon state law, Oregon Secretary of State, Corporation Division Registry No. 138239-84.  OUI's principal place of business is in the State of Idaho, and OUI is duly authorized to transact business in the State of Idaho, pursuant to a Certificate of Authority, Idaho Secretary of State No. C88710.

8.     Plaintiff MediaSnap Solutions LLC ("MediaSnap") is a limited liability company in the State of Delaware, duly organized pursuant to Delaware state law, Delaware Department of State, Division of Corporations No. 5174595. MediaSnap has two members: (1) the Beck Family Trust; and (2) Crisiant, LLC.

The Beck Family Trust has one sole trustee and beneficiary, Barbara Beck, who is a citizen of the State of California. Crisiant, LLC has three members: (i) Ryan Clark, a citizen of the State of Idaho; (ii) Michelle Schlegel, a citizen of the State of Indiana; and (iii) Angela Bonnell, a citizen of the State of Illinois. (OIU and MediaSnap shall be collectively referred to as "Plaintiffs.")

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction based upon diversity under 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.

10.     Venue is proper with this Court for the reasons set forth in the August 9, 2017 order issued in this action by the United States District Court for the District of Idaho. [Doc. No. 50].

## CONSPIRATORIAL LIABILITY

11.     Mr. Saunders is individually liable for his acts and those of the co-conspirator Defendants, whether named or unnamed, committed in furtherance of the conspiracies described herein.

12.     Mr. Saunders is individually liable as an aider and abettor of the acts of the co-conspirator Defendants, whether named or unnamed, committed in furtherance of the conspiracies described herein.

13.    Mr. Saunders was a member of or associated with and directly or indirectly controlled, or participated in the control of, the racketeering enterprise described in this Amended Complaint through the pattern of racketeering activity described herein.

14.    Mr. Saunders conspired with the co-conspirator Defendants to conduct or participate in the conduct of one or more of the racketeering enterprises described in this Complaint through the pattern of racketeering activity described herein.

15.    The Defendants are jointly and severally liable for the damages alleged in this Complaint.

## GENERAL ALLEGATIONS

16.    OIU is a provider of telephone public utility services in parts of Oregon and Idaho.  OIU's business is founded upon connecting the rural communities of Idaho, Oregon and Nevada with reliable, high quality, telecommunication services.

17.    Since it began service in 1990, OIU has modernized telecommunication facilities in eastern Oregon and throughout its service area in Idaho.

18.    In 1995, OIU expanded its operations area to include additional exchanges in Humboldt County, Nevada and additional areas of service in Oregon.

19.    In 2007, OIU began offering broadband DSL in its service areas in Idaho, Oregon, and Nevada.

20.    In 2010 - 2012, OIU began to consider options for offering its rural customer base internet TV services.

## Early Communications Between Skitter and OIU

21.    In late April, 2012, Scott Remillard, Skitter's Vice President of Sales, participated in two to three telephone conversations with Doug Musgrave, OIU's General Manager, during which Mr. Remillard made several misrepresentations about Skitter's products and capabilities.  For example, Mr. Remillard represented to Mr. Musgrave that:

        a.    Skitter had a working platform which, if OIU became a Skitter franchisee, would enable OIU to provide its customers with a full television channel line-up, including standard local, cable and satellite channels, through an inexpensive Roku or Western Digital set-top box (the "Product");

        b.    The Product was a simple, inexpensive niche television and internet product which would be easy to market to OIU's existing customer and subscriber base;

        c.    The Product would deliver tailored television content, which could be bundled in a manner specific to each individual customer, along with additional internet content through the inexpensive set-top box;

d.    Skitter would provide all of the "head-end equipment" (e.g., equipment that would be used at OIU's master facility to receive communications signals for distribution to a local region), and as such, the service would require minimal capital expenditures by OIU; and

e.    Skitter would be solely responsible for providing the content.

22.    The simple, inexpensive niche television and internet product was important to OIU as it would allow OIU to differentiate the Product when marketing to OIU's customer and subscriber base.

### Skitter's April 25th Webinar

23.    On April 25, 2012, Mr. Remillard, at the request of Defendant Robert Saunders, provided a presentation to Mr. Musgrave (OIU's General Manager), Ryan Clark (OIU's Vice President); and Justin Perez (OIU's controller), regarding the expected future financial performance of the Skitter products for franchisees. The April 25, 2012 presentation was done via telephone and included a webinar.

24.    During the April 25th presentation, Mr. Remillard made many misrepresentations.  For example, Mr. Remillard confirmed earlier representations that the Product would fit the niche that OIU was looking to fill, at "very low risk and start-up" costs to OIU.

25.    Mr. Remillard further represented that Skitter would:

a.    Install and maintain all head-end equipment;

7

b.      Negotiate and obtain all retransmission and content agreements for local channels and 54 Satellite channels; and

c.      Ensure a "quickstart" for the installation process and delivery of content, whereby OIU would be able to begin selling subscription services for local channels within ninety days of execution of a Franchise Agreement, providing an immediate revenue source.

26.    Unbeknownst to OIU, these representations were false.  Skitter did not have the capabilities to deliver the head-end equipment, nor did it have the capability to deliver content within 90 days of execution of a Franchise Agreement.

27.    In the April 25th presentation, Mr. Remillard offered OIU two different packages – one costing $225,000 for local and 54 Satellite channels, and one costing $64,995 for local channels only.  When presenting these packages, Mr. Remillard indicated that all channels (both local and Satellite channels) could be run through inexpensive Roku or Western Digital boxes.

28.    Unbeknownst to OIU, this representation was also false.  The Roku and Western Digital boxes could only provide local channels and lacked the capabilities to handle Satellite channels.  Instead, customers who wanted Satellite channels would be required to purchase a far more expensive set-top box called Amino boxes.

29.    In other words, during the April 25th presentation, Mr. Remillard encouraged OIU executives to purchase a $225,000 franchise (including all local and Satellite channels) without informing them that customers who wanted to receive Satellite channels would have to buy an expensive Amino box instead of an inexpensive Roku/Western Digital box.

30.    During the April 25th presentation, Mr. Remillard also described the benefits of becoming a franchisee, and he encouraged OIU to purchase franchise rights to three Designated Market Areas ("DMAs"):  Boise, Salt Lake City, and Reno-Carson.

31.    Mr. Remillard also noted that franchisees would have access to a lucrative Skitter program called the "DMA Resale" program, whereby OIU would be entitled to 50% of the profits earned from any sales of the Skitter Product in the three DMAs.

32.    Mr. Remillard presented market research completed by Skitter, which purported to identify:  the size of the prospective customer base within the Boise, Salt Lake City, and Reno-Carson DMAs; a "conservative" percentage of the customers within these three DMAs who would purchase the Product over a three (3) year period; and the cost and revenue associated with the DMA resale program.

33.   Mr. Remillard represented that, based upon Skitter's "conservative" estimate of sales to five percent (5%) of the customer-base, the projected revenues for the three DMAs were as follows:

   a.   Boise DMA - $28,914.80 ("total profit margin per month");

   b.   Salt Lake City DMA - $208,000.85 ("total profit margin per month"); and

   c.   Reno-Carson DMA - $60,776.24 ("total profit margin per month").

34.   Mr. Remillard knew that these representations regarding costs and financial performance were false and were made to induce Plaintiffs to enter into a Franchise Agreement and purchase the Boise, Salt Lake City and Reno-Carson DMAs.

## The Franchise Disclosure Document

35.   On or about April 30, 2012, Mr. Remillard emailed Mr. Musgrave a Franchise Disclosure Document (the "FDD"), the Franchise Agreement, and the DMA Resale Agreement.  In the April 30th email, Mr. Remillard stated as follows: "Attached are the . . . Franchise and DMA Resale documents.  Please review the FDD first. . . .   The separate Franchise [Agreement] . . . and DMA Resale Agreements are what you'll sign, if you decide to move forward."

36.    The FDD contained many representations which were false.    For example:

a.    The FDD represented that for an initial franchise fee of $225,000.00, Skitter would "deliver to your location the equipment you need in order to broadcast television content to your customer."    These representations were false, because Skitter was unable to deliver the head-end equipment in the manner promised.

b.    The FDD also stated that "there are 2 different manufacturers of set top boxes that are used for video delivery," the $100.00 Roku and Western Digital boxes.    This representation was false, as the Roku and Western Digital boxes could only provide local channels and lacked the capabilities to handle Satellite channels.

c.    The FDD also stated that the "initial startup phase . . . may be 12 months" for the delivery of satellite services.    This was false, as Skitter lacked the capability and resources to provide the head-end equipment and the content within 12 months.

d.    The FDD contained a representation that forty (40) new franchised outlets were projected in the next fiscal year, which projection had no basis in fact.

e.      Under federal law, Skitter was required to include in the FDD copies of specific and complete financial documents and disclosures. Skitter failed to comply with this federal requirement. Further, the "Financial Statements" attached to the FDD as Exhibit "B" were false or materially inaccurate, as they overstated the company's cash flow and financial stability, among other things.

37.    Defendants subsequently failed to properly update the Franchise Disclosure Document as required by federal law and failed to disclose material adverse financial events.

## Communications Preceding the Franchise Agreement

38.    On May 3, 2012, Mr. Remillard informed Mr. Musgrave that OIU had to sign the Franchise Agreement by June 1, 2012, or the franchise fee would increase.

39.    Between May 3 and May 31, 2012, Mr. Saunders and Mr. Remillard had a series of communications with Mr. Clark (OIU's VP), Mr. Musgrave (OIU's GM) and Jeff Beck (OIU's President) regarding the Boise, Salt Lake City, and Reno-Carson DMAs and the associated DMA resale program in those areas. The communications occurred via email and telephone.

40.    For example, on May 3, 2012, Mr. Remillard sent Mr. Musgrave an email in which Mr. Remillard touted the advantage of being "first in" in a DMA.

Specifically, Mr. Remillard stated as follows: "You could be the first DMA Resale provider in the Boise, Pocatello-Idaho Falls, and Salt Lake City DMAs. Any customers acquired are yours to keep."

41.    Similarly, on May 18th, Mr. Remillard sent Mr. Musgrave an email, in which he indicated that OIU would have resale rights in the Boise, Salt Lake City and Reno-Carson DMA's.

42.    On May 18, 2012, Mr. Clark and Mr. Musgrave were introduced to Defendant Bob Saunders.

43.    Shortly thereafter, Mr. Saunders participated in a phone call with Mr. Clark and Mr. Musgrave, wherein Mr. Clark and Mr. Musgrave expressed concern about investing a significant amount of money in DMAs such as Salt Lake City (where OIU had a very small customer base) and Reno-Carson (where OIU's customer base was modest). Mr. Saunders responded that the biggest benefit to purchasing franchises in those DMAs would be the significant revenue stream from the DMA resale program, and that the income from DMA resale would "pay for" the initial franchise fee.

44.    Mr. Saunders also informed Mr. Clark, Mr. Musgrave and Mr. Beck that the DMA resale program to the Boise, Salt Lake City, and Reno-Carson DMAs was included as part of the franchise package.

45.    On May 28, 2012, Jeff Beck and Mr. Saunders negotiated amendments to Exhibit A to the Franchise Agreement, which outlines OIU's Franchise Zones.  OIU already had certificated telephone service areas in certain parts of the Boise, Salt Lake City and Reno-Carson DMAs, and Mr. Beck proposed amendments that gave OIU:  (1) exclusive rights to sell Skitter TV products in those certificated service areas; and (2) non-exclusive rights to sell Skitter TV products in the parts of the DMAs that were not covered by OIU's certificated service areas.  When Mr. Beck sent his proposed amendments to Mr. Saunders, Mr. Beck stated as follows:  "I have .  .  .  revised Exhibit A, which I think now conforms to the intention that the rights within our certificated areas are to be exclusive and the DMA resale rights non-exclusive."

46.    In late May 2012, Mr. Clark expressed concern over an article that he had found regarding Skitter's franchisee in Portland, Oregon.  Specifically, on May 17, 2012, Mr. Clark found an article indicating that Fox's affiliate in Portland determined that Skitter did not have permission to carry its signal, and that ABC, CBS, Fox and NBC broadcast affiliates in Portland instructed Skitter to stop distributing their network feeds due to concerns with Skitter's transmission rights (or lack thereof).  The article also mentioned a lawsuit against a company named Aereo (which provided TV services similar to those provided by Skitter), which company was being sued by major broadcasters for copyright infringement.

47.     On or about May 18th, Mr. Clark asked Mr. Saunders about the article, and Mr. Saunders downplayed the legal issues raised therein.  Specifically, Mr. Saunders told Mr. Clark that Skitter would not run into the problems that Aereo ran into because Skitter had valid retransmission agreements, and Aereo did not.  Mr. Saunders also indicated that the Portland franchisee's legal problems were unique to the Portland DMA and would not be repeated with OIU.

48.  Mr.  Saunders  and  Mr.  Remillard  made  these  material misrepresentations and omissions to induce Plaintiffs to become a franchisee, although they knew, or should have known, that Skitter could not provide the services, equipment, or content as required by the Franchise Agreement.

## Franchise Agreement

49.     Based on the foregoing misrepresentations and omissions, on June 5, 2012, OIU executed the Franchise Agreement.  Attached hereto as Exhibit "A" is a true and correct copy of the Franchise Agreement.

50.     The Franchise Agreement states that Skitter "will furnish to [Plaintiffs] a content channel offering as described in Exhibit B to this Franchise Agreement."   Exhibit B lists 7 local channels that were included in the channel lineup, and an additional 54 satellite channels that could be selected as part of the channel lineup.

51.    Similarly, as part of the Franchise Agreement, Plaintiffs invested one dollar ($1.00) in Southeast Content Group and TBM Content Partners, and in return, Plaintiffs received an ownership interest in both Southeast Content Group and TBM Content Providers.  The Franchise Agreement provides that "Ownership in each LLC provides rights to the Franchisee to receive broadcast television and premium television content as described in Exhibit 'B' [to the Franchise Agreement]."

52.    As part of the Franchise Agreement, Skitter also represented and warranted that, among other things, it:

a.    "Owns or otherwise possesses sufficient rights in the products, equipment, content and licensed software as required to perform and provide the Skitter services under [the Franchise Agreement] and for the video service to be displayed, accessed, and/or utilized in the manner contemplated by [the Franchise Agreement], including Franchisee's distribution of Skitter TV channels to end users in the Franchise Zone without liability to any content owner or third party";

b.    Had "full power and authority to undertake the obligations set forth in [the Franchise Agreement]";

c.    "Shall comply in all respects with all applicable laws and regulations affecting the subject matter [of the Franchise Agreement]; and

d.    "[A]s of the Effective Date, Skitter has not received any notification from any third party that the Skitter products, video channels or distribution, equipment of services is claimed to violate or infringe any copyright, trade secret, trademark, patent, or any other intellectual property right of any third party."

53.    Exhibit A to the Franchise Agreement gave OIU exclusive rights to sell Skitter TV products in OIU's certificated service areas and non-exclusive rights to sell Skitter TV products in the parts of the Boise, Salt Lake City and Reno-Carson DMAs that were not covered by OIU's certificated areas.

54.    Based on Exhibit A and on Mr. Saunders' and Mr. Remillard's prior written and verbal misrepresentations, Mr. Musgrave reasonably expected to sign a separate DMA Resale Agreement shortly after the Franchise Agreement was executed.

55.    Based on Mr. Remillard's and Mr. Saunder's misrepresentations and the misrepresentations contained within the April 25th presentation, the FDD and the Franchise Agreement, OIU caused a wire transfer of $295,000.00 to Skitter on June 6, 2012, as required by the Franchise Agreement.

56.    The $295,000.00 included an initial franchise fee of $225,000.00 which covered the Boise, Idaho DMA, along with an additional $70,000.00 for the two additional DMAs in Salt Lake City, Utah, and Reno, Nevada.

57.     In exchange for the payments made by Plaintiffs as consideration for the Franchise Agreement, Skitter was to provide products, equipment and content necessary for OIU to participate in the resale program and to sell local and satellite television packages to its customers and subscribers.  Southeast Content Group and TBM Content Partners were to assist in providing the content.

58.     These representations and warranties contained in the Franchise Agreement were false because Skitter did not have sufficient capabilities to deliver and provide the products and equipment, and Skitter, Southeast Content Group and TBM Content Partners did not own or possess sufficient rights in the content to perform its duties under the Franchise Agreement.

59.     Plaintiffs were not aware that the representations and warranties made by Skitter in the Franchise Agreement were false.

60.     On June 6, 2012, OIU assigned to MediaSnap its rights and obligations under the Franchise Agreement.

## Plaintiffs' Reliance on Misrepresentations

61.     On June 19, 2013, Larry Pechacek, Skitter's Director of Customer Engineering, emailed Mr. Musgrave, Mr. Beck and Mr. Clark a Skitter "Quickstart guide," and he reviewed the Quickstart guide in a teleconference with them that same day.  During the teleconference, Mr. Pechacek represented that:

a.      Skitter would provide Plaintiffs with the hardware and equipment necessary to deliver the Product to Plaintiffs' customers; and

b.      Plaintiffs needed to start purchasing certain equipment, such as Roku boxes and Western Digital equipment, so that Plaintiffs could deliver the Product to Plaintiffs' customers in a timely fashion.

62.      Thereafter, Plaintiffs began to purchase the equipment required by Skitter in order to complete the "Quickstart," because they wanted to begin marketing the television services to customers and create a revenue stream immediately.  Specifically, Plaintiffs purchased a number of Roku set-top boxes and Western Digital equipment.  Plaintiffs also began working to form relationships with third-party internet vendors to assist with expected online customer subscriptions.

63.      In late June or early July 2012, Mr. Saunders first informed Mr. Musgrave that DMA resale could not "currently" be implemented, because Skitter had received a threat of "legal action" from CBS and because of legal issues related to the Aereo lawsuit (referenced in Paragraph 47 above).  Mr. Saunders further stated that he was "confident" that the DMA resale service would be available "soon."

64.      Between June 2012 and December 2012, Plaintiffs attempted to order and secure the equipment necessary to implement Skitter's services.  Plaintiffs'

expenses included costs to prepare their facility and order the equipment necessary for the installation of Skitter's head-end equipment.  Plaintiffs expended significant funds in order to get the necessary equipment to Plaintiffs' facilities, and get the equipment installed and aligned before weather impacted the process.

65.    Between June 2012 and December 2012, Defendants failed to provide the services, equipment, and content as required by the Franchise Agreement and specifically failed to provide the promised ability to market the Product within ninety (90) days of execution of the Franchise Agreement.

## Private Placement Offering

66.    In January, 2013, Skitter solicited Plaintiffs and other third-parties to be part of a "private placement" of stock in Skitter.  In the Private Placement Offering ("PPO"), Skitter represented that it held the rights to distribute "the most popular cable channels."

67.    The PPO made several misrepresentations similar to those made to Plaintiffs.  For example, in the PPO, Skitter represented that:

      a.    Skitter provides the head-end equipment for its franchisees;

      b.    Skitter offers franchisees an ability to enter the internet television distribution business for low up-front costs;

      c.    Skitter's systems and products are easily integrated with franchisees' systems and could be deployed rapidly and efficiently; and

> d. Skitter provides franchisees with retransmission rights, and as of January 2013, Skitter had received retransmission rights to almost all major cable programming services.

68. The PPO also made it clear that Skitter's conduct with Plaintiffs was not unique to Plaintiffs. According to the PPO, 13 franchisees had been under contract with Skitter since 2011 or 2012 and had yet to be deployed.

69. In the PPO, Skitter represented that all 13 of these franchises were to be deployed between February 2013 and May 2013, and the PPO specifically stated that Plaintiffs' services would be deployed in April 2013. These representations were false.

70. Additionally, the PPO made it clear that Skitter would continue to seek franchisees in the same manner it sought out Plaintiffs. Indeed, the PPO stated that there are approximately 750 small to mid-sized telephone companies in the United States, and Skitter planned to target approximately 625 of them.

71. Finally, the PPO also made it clear that Skitter had misrepresented its financial viability to Plaintiffs. Specifically, the PPO requested an investment of five million dollars ($5,000,000.00) in exchange for a ten percent (10%) ownership in Skitter, and further stated that "a portion of proceeds from this Offering will be used to secure equipment, software and installation of planned deployments." Indeed, the PPO indicated that approximately $375,000 of the proceeds from the

PPO would "be used to complete the build out and deployment of systems that have been contracted for with the Company."

72.    Prior to the PPO, Mr. Saunders and Skitter failed to disclose that despite Plaintiffs' $295,000 franchise payment, Skitter had not yet secured the equipment or software necessary for the deployment of services or content in Plaintiffs' DMAs.   Based upon information and belief, Skitter used Plaintiffs' $295,000 franchise payment for expenses unrelated to Plaintiffs.

### Skitter's Proposed Amendments to and Breaches of Franchise Agreement

73.    On or about February 27, 2013, Mr. Saunders sent Mr. Clark an email, wherein Mr. Saunders asked Mr. Clark to sign an Amendment to the Franchise Agreement and pay an additional $145,000 on behalf of OIU.   The proposed Amendment stated as follows:  "[I]n order to build out the Skitter head end at the facilities of OIU pursuant to the [Franchise Agreement], additional capital is required by Skitter in the amount of $145,000. . . .   Upon execution of this Amendment, OIU shall remit such amount to Skitter and Skitter shall promptly acquire, deliver and install the [head end] Equipment."

74.    Around this same time, Mr. Saunders told Mr. Musgrave that Skitter had to "sell" two more Franchise Agreements (and get two more franchise fees) to be able to afford building out Plaintiffs' head-end equipment.  Mr. Saunders stated "that's just how we operate."

75.    On or about March 5, 2013, Mr. Saunders provided Mr. Clark with a modified list of equipment that Skitter needed to purchase as part of its duties under the Franchise Agreement, and Mr. Saunders asked Plaintiffs to pay $78,000.00 to finance Skitter's efforts to purchase such equipment.

76.    On or about March 5, 2013, Mr. Clark informed Mr. Saunders that Plaintiffs would not be taking part in the PPO.  Shortly thereafter, Plaintiffs informed Mr. Saunders and Skitter that they would not be providing the additional funds Skitter requested on February 27th and March 5th.

77.    Based upon information and belief, after Plaintiffs declined Mr. Saunders' and Skitter's various solicitations for additional funds, Mr. Saunders and Skitter began prioritizing other franchisees over Plaintiffs.  Indeed, in late March 2013, a former high ranking Skitter employee told Mr. Musgrave that Mr. Saunders and Skitter put Plaintiffs' franchise "at the back of the line" for delivery of equipment and services.

78.    On or about May 1, 2013, Defendant Robert Saunders contacted Plaintiffs and suggested that Defendants could deliver the content to MediaSnap via fiber optic connection instead of using the satellite deployment that Plaintiffs had already constructed in accord with the Franchise Agreement and Skitter's prior representations and instructions.

79.     By this time, OIU and MediaSnap had already expended in excess of $45,000.00 to purchase and install equipment to enable it to provide the Product to its customer and subscriber base.

80.     On May 30, 2013, Mr. Saunders informed Mr. Clark that Skitter had failed to perform the Franchise Agreement because of financial issues.   Mr. Saunders specifically stated that Skitter was "flat broke."  Prior to this time, no one at Skitter had properly disclosed Skitter's financial condition and/or materially adverse financial events.

81.     On June 6, 2013, Skitter told Plaintiffs' executives that Skitter had not yet received retransmission rights from certain local channel broadcasters and that they might not be able to provide west coast channel feeds to Plaintiffs' subscriber base despite prior representations to the contrary.

82.     On or around June 6, 2013, Mr. Saunders and Skitter signed a letter ("Extension Letter"), wherein Mr. Saunders and Skitter acknowledged that they had not delivered to Plaintiffs the necessary content licensing and equipment as required by the Franchise Agreement.

83.     In the Extension Letter, Skitter expressly waived its right to terminate the Franchise Agreement under Section 3(b) thereof.  Section 3(b) of the Franchise Agreement  purportedly  allows  Skitter  to  cancel  and  terminate  the  Franchise

Agreements of those franchisees who fail to launch the Product within one year after signing the Agreement.

84.    In the Extension Letter, Skitter further agreed that Plaintiffs could terminate the Franchise Agreement and receive a $295,000 refund if Skitter did not deliver all necessary content licensing and equipment to Plaintiffs by March 6, 2014.

## The Bailout of Skitter and Galva, and the Creation of Video 6

85.    On December 28, 2012, Galva was formed in the State of Georgia. Galva is a subsidiary of Skitter, and Skitter is Galva's managing partner.

86.    Upon information and belief, Galva became the content provider for Skitter and Skitter franchisees sometime prior to June 2013.

87.    In June 2013, the Kingdom Telephone Company ("Kingdom Telephone") was a Skitter franchisee, and upon information and belief, its Skitter services had not yet launched.

88.    On or about June 18, 2013, Tom Young, the General Manager for Kingdom Telephone, organized a meeting of Skitter franchisees to solicit additional funds for Mr. Saunders, Skitter and Galva.  Eight franchisees attended the meeting, and during the meeting, they discussed forming an LLC to infuse cash into Skitter and change the course of Skitter's business trajectory.

89.    Mr. Musgrave attended the June 18th meeting, and learned that Mr. Saunders, Skitter and Galva previously had provided grossly overstated revenue projections.

90.    On June 24, 2013, Mr. Young, on behalf of Kingdom Telephone, sent an email to Mr. Musgrave in which he asked Plaintiffs to make additional payments in order for Skitter and Galva to "make payroll."  These payments were not required by the Franchise Agreement, and Mr. Young specifically stated that any payments would "be a loan, it is not a gift."

91.    On or about June 26, 2013, Plaintiffs made a wire transfer in the amount of $4,500.00 to Kingdom Telephone to assist Skitter and Galva to "make payroll."

92.    On or about June 26, 2013, Mr. Saunders and Skitter for the first-time informed Plaintiffs that customers and subscribers who wanted to receive Satellite channels through the Skitter Product would have to buy Amino boxes instead of Roku or Western Digital boxes.  This change in equipment added significant cost and hurdles to Plaintiffs' ability to market the Skitter Product and effectively changed the Product from a simple, inexpensive niche television and internet product to a more typical, and not cost-effective, cable television offering.

93.    Throughout June and August 2013, Mr. Young and the franchisees who attended the June 18th meeting continued to discuss the possibility of forming

an LLC to bailout Mr. Saunders, Skitter and Galva.  During these discussions, several franchisees expressed the view that Skitter needed to "be more like a traditional cable TV company," and that building out head-end equipment was "too expensive" to be viable.  Indeed, one franchisee told Mr. Musgrave that Plaintiffs were "probably out" because Skitter had not yet built out their head-end equipment and would likely lose their investment if the bailout went forward.

94.    Plaintiffs chose not to make additional payments to Skitter, Galva or Mr. Saunders, and chose not to participate in the creation of the LLC.

95.    On August 22, 2013, Mr. Young sent an email to Mr. Musgrave, indicating that Kingdom Telephone and five other Skitter franchisees "have formed an LLC called Video 6."  The email indicated that company Video 6 intended to exert control over Skitter's business decisions and business trajectory and would serve as a "conduit" of funds to and from Skitter.

96.    Based upon information and belief, Video 6 has been exerting improper control over the business decisions and business trajectory of Skitter since its formation.  Plaintiffs were never informed that Video 6 was appointed or authorized to act as an agent of Skitter or other Defendants.

## Further Breaches and Delays by Skitter and Galva

97.    On or about October 30, 2013, a Skitter project manager informed Plaintiffs that the service would not be available until January 2014, and that

Skitter and Galva still did not have all the necessary retransmission rights. Additionally, Plaintiffs had still not received all the necessary head-end equipment from Skitter.

98.    On or about December 6, 2013, a Skitter project manager informed Plaintiffs that the "launch date" had been moved again to February 2014, and that Skitter and Galva still did not have all the necessary retransmission rights.

99.    On or about February 25, 2014, Plaintiffs learned that they would no longer be able to provide the Product using satellite equipment and thereafter the services would only be available through fiber optic cable.   Based upon information and belief, Mr. Saunders, Skitter, Galva and Video 6 knew of this fact a significant amount of time prior thereto.

100.    On February 28, 2014, Mr. Saunders informed Plaintiffs that Skitter would have to build different head-end equipment at the Plaintiffs' facility in order to restore access to content which was to be provided under the Franchise Agreement.   This new requirement further moved the "launch date" for Plaintiffs "to be determined" at some future date.

101.    On or about March 27, 2014, Skitter notified Plaintiffs that the necessary head-end equipment would ship in approximately May 2014, with a target "launch date" for services of July 1, 2014.

102.   On or about June 4, 2014, Skitter notified Plaintiffs that the necessary head-end equipment would ship later that month, with a target "launch date" for services of August 1, 2014.

103.   On or about June 26, 2014, Skitter notified Plaintiffs that the necessary head-end equipment would ship in July, 2014, with a new target "launch date" for services of September 2014.

104.   On or about July 24, 2014, Plaintiffs received a partial shipment of the new head-end equipment from Skitter, and completed installation of this portion of the equipment on September 15, 2014.

105.   However, in early October 2014, Skitter informed Plaintiffs that it was converting to a different server which would require yet another change of equipment at Plaintiffs' facility.   The new server was shipped and installed in December, and Skitter moved the "launch date" to February 2015.

106.   Despite Mr. Saunders' and Skitter's prior representations, issues with the head-end equipment precluded Plaintiffs from launching Skitter services for several months.

107.   On or about June 18, 2015, Plaintiffs were able to "soft" launch Skitter local television services, but other Skitter services did not yet function.   The "soft" launch had numerous problems.   On June 30, 2015, Plaintiffs activated their first account.

108.   On July 23, 2015, Skitter declared that Plaintiffs have officially "launched" Skitter Cable TV services, over three years after the Franchise Agreement was executed.

109.   However, Skitter and Galva were still unable to provide the equipment, content, and services in all three of Plaintiffs' DMAs.  Rather, Skitter was only able to provide limited, unstable services in the Boise DMA area.

110.   Skitter and Galva's failure to launch services in all three DMAs has left Plaintiffs unable to market the services to over fifty percent (50%) of Plaintiffs' customers.

111.   Despite Skitter's and Galva's failure to properly provide the equipment, content, and services required by the Franchise Agreement, Galva continued to invoice Plaintiffs for content.

112.   On January 1, 2016, the retransmission rights that Skitter and Galva had with AMC television networks expired, and AMC and several other channels "went dark."  This added to the significant amount of content which the Franchise Agreement required but which was not provided.

## Skitter Terminates the Franchise Agreement

113.   In February 2016, Mr. Saunders contacted Mr. Musgrave and requested that Plaintiffs remove the Satellite head-end equipment and ship it back to Skitter.

114.   When Mr. Musgrave objected to Mr. Saunders' request, Mr. Saunders informed him that Skitter and Galva no longer operate in the way that they did when the Franchise Agreement was executed.  Specifically, Skitter and Galva no longer provide the inexpensive, niche Product which was sold to Plaintiffs as part of the Franchise Agreement.  Instead, Skitter and Galva were going to operate like a cable company.

115.   On or about April 6, 2016, Mr. Saunders sent Plaintiffs a letter which purported to terminate the Franchise Agreement (the "Termination Letter").

116.   The "Termination Letter" stated that "Skitter is terminating the Agreement pursuant to the terms of Section 15(a)(i) of the Agreement (failure to launch within one year) effective immediately," even though Mr. Saunders, Skitter, Galva and Video 6 were solely responsible for the failures of the Product.

117.   On or about May 1, 2016, Mr. Saunders, Skitter, and Galva shut off all services to Plaintiffs' customers without additional notice to Plaintiffs.

118.   On May 2, 2016, Mr. Saunders contacted Mr. Musgrave and informed him that Plaintiffs' customers were not getting services because Skitter had "shut it down."

119.   Skitter has, to date, failed to deliver all necessary content licensing and equipment to Plaintiffs.

120.    Plaintiffs have not been repaid the $4,500.00 loan made to Kingdom Telephone for the benefit of Skitter and Galva.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract against Defendants Skitter Cable TV, Skitter, Inc., Southeast Content Group and TBM Content Partners)

121.    The Franchise Agreement was a contract between Plaintiffs and Defendants Skitter Cable TV, Skitter, Inc., Southeast Content Group, and TBM Content Partners.

122.    Plaintiffs provided consideration for the Franchise Agreement through the payment of $295,000.00 to these Defendants.

123.    In exchange for the consideration, Defendants Skitter Cable TV, Skitter, Inc., Southeast Content Group, and TBM Content Partners were to provide products, equipment, content, and software necessary for Plaintiffs to sell local and satellite television packages to Plaintiffs' customers and subscribers.

124.    Defendants Skitter Cable TV, Skitter, Inc., Southeast Content Group, and TBM Content Partners breached the terms and conditions of the Franchise Agreement by, among other things:

a.    Failing to have full power and authority to undertake the obligations in the Franchise Agreement;

b.    Failing to comply in all respects with applicable laws and regulations affecting the subject matter of the Franchise Agreement;

32

c.    Failing to own or otherwise possess the products, equipment, content and software required to perform under the Franchise Agreement;

d.    Failing to use the consideration paid by Plaintiffs to purchase the equipment necessary to launch the services to Plaintiffs' customer base;

e.    Failing to provide the Product as required by the Franchise Agreement;

f.    Failing to provide DMA resale as required by Exhibit A to the Franchise Agreement;

g.    Changing the business model from what was sold to Plaintiffs pursuant to the Franchise Agreement, with inexpensive set-top boxes, to a more expensive and less marketable product;

h.    Failing to provide equipment that functioned properly and was capable of providing the satellite and other services to Plaintiffs' customers;

i.    Failing to provide the services they were required to provide the Franchise Agreement;

j.    Failing to launch the services which were the subject of the Franchise Agreement within a reasonable time or as otherwise required by the Franchise Agreement;

k.    Failing to provide equipment and failing to launch the services in each of the DMAs sold to Plaintiffs;

l.      Failing to provide content required under the Franchise Agreement; and

m.      Improperly terminating the Franchise Agreement.

125.  The breaches of the Franchise Agreement have caused damage to Plaintiffs.

126.  The conduct of Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Southeast Content Group, and TBM Content Partners was willful and intentional, malicious, and exhibits reckless or callous indifference to Plaintiffs.

127.  Plaintiffs have been damaged in an amount to be proven at trial, but that amount exceeds $75,000.00.  Plaintiffs are further entitled to all available relief, including actual and compensatory damages, as well as costs and attorney fees.

128.  The Franchise Agreement is a commercial transaction, as that term is defined by Idaho law, and therefore Plaintiffs are entitled to recover their attorney fees and costs pursuant to Idaho Code §12-120(3), along with other applicable law.

## <u>SECOND CLAIM FOR RELIEF</u>
**(Fraud against Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva, Southeast Content Group and TBM Content Partners)**

129.  Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners made various ongoing misrepresentations of fact and false statements in the course of their

dealings with OIU and MediaSnap. As further detailed above, these misrepresentations included, but are not limited to, the following:

      a.    Skitter, Galva Cable Co., Southeast Content Group, and TBM Content Partners were able to provide a full channel line-up through its existing system;

      b.    Skitter was able to provide equipment necessary to allow Plaintiffs to provide the Product and other services to Plaintiffs' customers;

      c.    Plaintiffs would be able to "Quickstart" the Skitter Product and services within ninety (90) days of execution of the Franchise Agreement, such that Plaintiffs' would be able to begin the sale of services to Plaintiffs' customers;

      d.    Plaintiffs would be able to benefit from DMA resale within the three DMAs of Plaintiffs' Franchise Agreement;

      e.    DMA resale within the three DMAs of Plaintiffs' Franchise Agreement would conservatively provide a profit margin to Plaintiffs in the amount of $297,691.89 per month;

      f.    DMA resale would pay for the $295,000 franchise fee paid by Plaintiffs;

      g.    Skitter Cable TV, Skitter, Inc., Galva Cable Co., Southeast Content Group, and TBM Content Partners were financially viable;

h.    Plaintiffs' initial payments for purchasing the franchise in the three DMAs would be used to provide equipment necessary to launch services for Plaintiffs;

i.    The information contained in the Franchise Disclosure Documents was accurate;

j.    Plaintiffs would be able to launch services to Plaintiffs' customers and subscriber base.

k.    Plaintiffs would be able to launch services on a Roku or Western Digital box, which would allow delivery of content to Plaintiffs' customers and subscriber base;

l.    Skitter, Galva, Southeast Content Group, and TBM Content Partners would be able to provide the content and channels identified in the Franchise Agreement;

m.    The equipment and content packages which were to be sold by Plaintiffs to their customer and subscriber base would be inexpensive and cost effective; and

n.    Plaintiffs would be repaid the $4,500.00 in additional funds which were solicited from Plaintiffs as a "loan" for Defendants' ongoing operations.

130.    Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Southeast Content Group, and TBM Content Partners induced Plaintiffs to enter the Franchise Agreement and pay the consideration by promising that these Defendants would provide equipment, services, and content consistent with the Franchise Agreement, which Defendants knew they could never provide and in fact did not provide.

131.    Defendants Robert Saunders, Skitter Cable TV, Skitter, Inc., Galva, Southeast Content Group, and TBM Content Partners thereafter induced Plaintiffs to not cancel the Franchise Agreement and request a full refund by continually promising Plaintiffs that they would provide equipment, services, and content consistent with the Franchise Agreement, which Defendants knew they could never provide and in fact did not provide.

132.    The Defendants knew at the time they made them, that the statements and misrepresentations identified herein were false.

133.    The Defendants' conduct as identified herein was ongoing over the course of the Defendants' relationship with Plaintiffs.

134.    The Defendants intended that Plaintiffs rely upon the statements and misrepresentations made by the Defendants.

135.    Plaintiffs were ignorant of the falsity of the statements and misrepresentations made by Defendants.

136.  Plaintiffs' reliance on the statements and misrepresentations of Defendants was justifiable and reasonable.

137.  Plaintiffs have suffered damages as a result of the statements and misrepresentations made by Defendants.

138.  Plaintiffs have been damaged in an amount to be proven at trial, but that amount exceeds $75,000.00.  Plaintiffs are further entitled to all available relief, including actual and compensatory damages, special and punitive damages, and costs and attorney fees.

## THIRD CLAIM FOR RELIEF
**(Breach of Covenant of Good Faith and Fair Dealing against Defendants Skitter Cable TV, Skitter, Inc., Southeast Content Group and TBM Content Partners)**

139.  The Franchise Agreement is a contract between Plaintiffs and Defendants Skitter Cable TV, Skitter, Inc., Southeast Content Group, and TBM Content Partners.

140.  Implied in this contract is a covenant of good faith and fair dealing.

141.  The Defendants Skitter Cable TV, Skitter, Inc., Southeast Content Group, and TBM Content Partners interfered with the contract through their unlawful acts and then wrongfully terminated the agreement.  The Defendants' actions in doing so, and as alleged herein, violated the covenant of good faith and fair dealing.

142.   Plaintiffs have suffered damages in an amount to be proven at trial, in an amount in excess of $75,000, in addition to attorneys' fees and costs as a result of Defendants' breaches of the covenant.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and award the following relief:

1.   An award of general and special damages, along with costs and attorney fees, resulting from the Defendants' breach of contract;

2.   An award of general and special damages resulting from the Defendants' fraud, as well as all recoverable punitive damages;

4.   An award of general and special damages resulting from the Defendants' breach of the covenant of good faith and fair dealing;

8.   An award of costs and attorney fees as permitted by law;

9.   Any such further relief, equitable or at law, as justice allows.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted, this 6th day of March, 2019.

WOMBLE BOND DICKINSON (US) LLP

By:   */s/ Robert R. Ambler, Jr.*
      Robert R. Ambler, Jr.
      Georgia Bar No. 014462
      James E. Connelly
      Georgia Bar No. 181808
      Brendan H. White

Georgia Bar No. 458315
271 17th Street, NW, Suite 2400
Atlanta, Georgia 30363-1017
Phone: (404) 872-7000
Bob.Ambler@wbd-us.com
James.Connelly@wbd-us.com
Brendan.White@wbd-us.com

Thomas Guy Hallam, Jr.
Kathryn Kristin Harstad
Strindberg & Scholnick, LLC
1516 W. Hays Street
Boise, ID 83702
Phone: (208) 336-1788
guy@idahojobjustice.com
kass@utahjobjustice.com

*Attorneys for Oregon-Idaho Utilities, Inc. and
MediaSnap Solutions, LLC*

## **CERTIFICATE OF SERVICE AND TYPE SIZE COMPLIANCE**

Pursuant to Local Rule 5.1C and Standing Order No. 16-01, the foregoing document is prepared in Times New Roman, 14 point font, and was filed using the CM/ECF system, which will automatically provide notice of this document's filing to all attorneys of record by electronic means.

This the 6th day of March, 2019.

/s/ *Robert R. Ambler, Jr.*
Robert R. Ambler, Jr.
Georgia Bar No. 014462